ORLANDO A. SMITH

*v.*

JOHN FERGUSON.

1. LIMITATION—*good faith of holder of color of title.* A defect in the title, if known to the purchaser of land when he purchases, is not enough to establish the fact that he was not a purchaser in good faith, under the Limitation

law of 1839. If the purchase is made with an honest purpose of obtaining title, and under a *bona fide* belief that the party is getting title, he will be protected, under the statute, on possession and payment of taxes for seven successive years. The question of good faith is one of fact, for the jury.

2. The fact that a party purchasing land, in 1858, is shown to have had knowledge of a suit in regard to its possession in 1842, affords no sufficient evidence that his purchase was not made in good faith, nor is the fact that a partner of a former occupant, in 1856, leased the property to the grantor of the party sufficient to destroy the good faith of his purchase, in 1858, from the lessee, who then claimed the title, nor will the fact that the party, before purchasing, was informed that the title was not good, impeach the purchase.

3. Where a party purchases land, taking a deed therefor and paying for the same, it will be presumed, in the absence of proof to the contrary, that he purchased in good faith. Knowledge that his grantor's title was defective, or was not a perfect title, will not impeach the good faith of his purchase.

4. Where there is no actual fraud, and no proof showing that the color of title was acquired in bad faith (which means in or by fraud), it must be held to have been acquired in good faith. Where there is no proof that the party, in making the purchase, designed to defraud the person having the better title, or was actuated by fraud, the good faith of his color of title is not impeached.

APPEAL from the Circuit Court of La Salle county; the Hon. EDWIN S. LELAND, Judge, presiding.

Mr. JOHN B. RICE, and Mr. CHASE FOWLER, for the appellant.

Mr. E. F. BULL, for the appellee.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

This was an action of ejectment, brought by John Ferguson in the circuit court of La Salle county, against Orlando A. Smith, to recover a tract of land in the town of Marseilles, originally known as "the Funk acre."

The plaintiff introduced in evidence a patent from the United States to Woodworth, dated March 16, 1837, for the west half south-west quarter sec. 18, township 33, range 5 east, of which the land in question is a part; also, a deed from Woodworth to A. D. Butterfield, dated August 12, 1837, and a deed

from A. D. Butterfield to Seth Otis, dated January 10, 1837, for the acre of land; also, a deed from the heirs of Otis to the plaintiff, dated June 7, 1871. The plaintiff also introduced proof of the death of Otis, and that the persons in the deed last named were his heirs.

The defendant, to defeat the title of the plaintiff, relied upon claim and color of title, made in good faith, with actual possession in himself and grantors for seven successive years, and payment of all taxes assessed upon the land for the same period.

The first deed offered in evidence by defendant to establish color of title, was one from Joseph Funk to Alonzo Walbridge, dated January 20, 1858, and recorded March 27, 1858. It was then proven, that in the same year Geo. E. Hubbard rented the premises of Walbridge for $60 per annum, and remained in possession, as tenant, until the first of April, 1861, when he bought the property for $200, payable in five years, with interest at the rate of twelve and one-half per cent, payable annually, in advance. When he bought, he received a contract for a warranty deed in payment of the purchase money. Under this contract Hubbard occupied the property, and on the 4th day of November, 1865, Walbridge conveyed to him the east one-third of the acre of land, which we understand to be the land in controversy. This deed was recorded November 8, 1865. It also appears that Hubbard remained in the possession of the property until 1870, when he delivered the possession to the defendant, Smith. Hubbard, however, deeded the land to James Long, in 1869, and he paid the taxes in that year. The taxes for the years 1861, 1862, 1863, 1864, 1865, 1866, 1867 and 1868, were all paid by Hubbard.

It is clear, from the evidence, that the plaintiff established a regular chain of title to the property in question from the government to himself.

A question was raised in regard to the sufficiency of the proof of the heirs of Otis, but it was more technical than sub-

stantial, and it will serve no useful purpose to consider it here.

In regard to defendant's title, it is conceded in the argument that defendant established possession in himself and his grantors for seven successive years, under claim and color of title, accompanied with the payment of taxes for that period. But it is contended that the claim and color of title were not made in good faith, and this, as we understand the record, is the controverted question in the case.

There is no testimony in the record which even tends to connect the defendant, Smith, with bad faith in the purchase of the property. On the contrary, it is conceded that he acquired the property in good faith, and under his purchase he has erected a valuable building on the property, which, doubtless, gave rise to this litigation, as the property, before Smith improved it, was of but little value.

In regard to the purchase of Hubbard, the only evidence we find in the record that he did not acquire the property in good faith is the testimony of the plaintiff and his son, who, in substance, testified, that after the plaintiff had bought a part of the premises, Hubbard said he was glad plaintiff had purchased, because there had been difficulty about the title, and the plaintiff was just the man to straighten it out. This evidence, if undisputed, would not establish a want of good faith on the part of Hubbard. A defect in the title, if known to Hubbard when he purchased, would not be enough to establish the fact that he was not a purchaser in good faith. *Rawson* v. *Fox*, 65 Ill. 201, is conclusive upon this point. It was there said: " To hold that a person is chargeable with bad faith because the register of deeds or the judgment docket may show a paramount outstanding title, or that the title of claimant is defective, would operate as an abrogation of the statute." Now, although Hubbard may have known that defects existed, yet if, with an honest purpose of obtaining title, he purchased of Walbridge, and paid his money under a *bona fide* belief he was obtaining title, he ought to receive the pro-

tection of the statute, although he may have been mistaken in regard to the goodness of the title he acquired. But, aside from the force or effect of such evidence, Hubbard, who has no interest whatever in the result of this litigation, expressly denies that he ever made the statements attributed to him, and says that he never heard of any controversy about the land until Ferguson obtained the deeds from the Otis children,— that he received the contract for a deed from Walbridge in good faith, and had no knowledge that the title was defective or in dispute.

So far, then, as shown by this record, the evidence fails to show that Hubbard purchased in bad faith; but, as a part of the seven years' payment of taxes was made while Hubbard held a bond for a deed, it is contended that the payment was made under the deed from Funk to Walbridge, and if he was not a purchaser in good faith, the bar of the statute can not be invoked. Under this view, the principal part of the evidence upon the question of bad faith was directed to the purchase of Walbridge from Funk.

The question, then, narrows down to this: whether Walbridge purchased in good faith. It is true, the question was one of fact, to be found and settled by the jury like any other question of fact, and if the record shows testimony sufficient to sustain the verdict, under the uniform ruling of this court, we can not interfere; but if, on the other hand, there is a clear want of evidence to sustain the judgment, then it will have to be reversed.

From the evidence it appears that Seth Otis bought the property in 1837. At that time there was no controversy in regard to the title. In June, 1839, Otis rented the property to Col. Pierce. At this time there was a house and barn on it, used as a hotel and stage house. In June, 1841, Pierce bought the property, and received of Otis a contract for a deed, in which he obligated himself for $250, in addition to $300 which had been paid, to convey the premises. Pierce occupied the property a short time, and moved to Chicago, where he

died, in 1855. After Pierce left, one Kimball claimed the property, and Parmelia Cone testified that he obtained the possession from Pierce. "She supposed Kimball obtained the tract from Pierce in payment of some debts." Kimball died in 1849. Before his death, however, according to the testimony of Mrs. Cone, Joe Funk was occupying the property, as tenant of Kimball.

It appears, from the testimony of John T. Nichol, that, in 1851, he was employed by the administrator of the estate of Lovel Kimball to sell the property at public sale, and that he sold it to Joe Funk, who was then in possession, but no deed was made. Funk continued to occupy the property until January, 1858, when he sold and conveyed it to Walbridge.

We will now consider the evidence relied upon to establish that Walbridge was not a purchaser in good faith. On this point, plaintiff proved by Adam V. Hughes that in the spring of 1856 he rented the property to Funk; he stated that the property needed some repairs, and he told Funk to make the repairs and pay the taxes for the rent. Funk was to give thirty days' notice before leaving the property, and witness was to give two months' notice in case he wanted the property. This witness also testified, that he had a conversation with Walbridge in La Salle, in 1860, in which Walbridge told the witness that Funk was still living in his old home, and inquired the price. It was also shown by this witness, that in 1842 there was a trial before a justice of the peace between Ward and Kimball, in regard to the possession of the property, and Walbridge was one of the jurymen. It was also proven by Dr. Hathaway, that about the time Walbridge purchased of Funk he investigated the title, and had several conversations with Walbridge in regard to the "goodness" of the title. Aside from the fact that Walbridge had resided in the neighborhood for many years and knew who had lived upon the property, the foregoing is the substance of the proof relied upon to establish that Walbridge did not purchase in good faith.

That the testimony can not be regarded sufficient to establish bad faith in the purchase by Walbridge, must be apparent. Suppose he was a juryman in 1842, in a controversy at that time between Ward and Kimball in regard to the possession of the property, this would not be satisfactory evidence that the purchase made in 1858 was in bad faith. So many changes occur in a country like this during a period of sixteen years, and property is changing hands so often, that it would not necessarily follow that those who owned or possessed property in 1842, would be owning and possessing the same property in 1858, or that the title would remain in the same parties. Suppose Hughes, who, so far as appears, was a stranger to the title to the property, except he was related to Col. Pierce by marriage and was his partner in business at one time, leased, in 1856, the property to Funk, and Walbridge knew that fact. Such fact can not be regarded sufficient to destroy the good faith of the purchase in 1858 from Funk, who then claimed to be the owner of the property. Nor could the fact that Walbridge was told by Dr. Hathaway that the title was not good, be held sufficient to impeach the purchase. The fact that a person purchases a defective title, does not impeach the good faith of the purchase. But if this evidence, introduced by the plaintiff, when standing alone, was regarded sufficient to impeach the good faith of Walbridge's purchase, when considered in connection with the proof on the other side there can be no doubt in reference to its insufficiency. Kimball was in possession of the property from 1845 until he died, in 1849, under claim of ownership. In 1851, at public vendue, the land was sold by the administrator of Kimball's estate, and bought by Funk, who was then in possession. He continued to occupy, using and claiming the property as his own, offering to sell on different occasions.

Nelson Rhines, who resided near the property for many years, testified; that about the time Walbridge purchased, Funk offered to sell to him, claiming to own it, and he supposed it belonged to Funk. In 1857 Funk offered to sell to Shadwell;

he did not wish to buy, and so told Funk, who then made him his agent to sell, and he called Walbridge's attention to the fact the property was for sale, and the result was, he made the purchase. Walbridge, however, before making the purchase, consulted Mr. Gray, then an eminent lawyer, in regard to Funk's title, and Gray told him he had examined the matter, and from Funk's statement he was safe in buying; "if he wanted the property to go and buy it; Funk has all the title to it and has possession."

The presumption of law is, that Walbridge purchased in good faith. Does the evidence, when fully considered, overcome that presumption? It may be true that Walbridge knew, when he purchased, that Funk's title was defective, or at least not a perfect title, but that did not impeach the good faith of the purchase, as said in *McCagg* v. *Heacock,* 42 Ill. 153. The doctrine is, that bad faith, as contradistinguished from good faith, in the Limitation act, is not established by showing actual notice of existing claims or liens of other persons to the property, or by showing a knowledge, on the part of the holder of the color of title, of legal defects which prevent the color of title from being an absolute one. Where there is no actual fraud, and no proof showing that the color of title was acquired in bad faith, which means in or by fraud, this court will hold it was acquired in good faith.

In *McConnel* v. *Street,* 17 Ill. 254, where the proper meaning of the words "good faith," as used in the Limitation act of 1839, was under consideration, it was said, "good faith, within the meaning of this statute, I understand to be the opposite of fraud and bad faith, and its non-existence, as in all other cases where fraud is imputed, must be established by proof." So, too, in *McCagg* v. *Heacock,* 34 Ill. 476, where the statute was under consideration, it was said, the good faith required by the statute in the creation or acquisition of color of title, is, freedom from a design to defraud the person having the better title. So far as is shown by this record, there is not a particle of proof that Walbridge, in making the purchase,

designed to· defraud any person, or that he was actuated by fraud, which seems to be an essential element in the purchase if it is to be impeached as having been made in bad faith.

The evidence we do not regard sufficient to sustain the verdict of the jury, and for this reason the judgment will be reversed and the cause remanded for another trial.

*Judgment reversed.*